FILED
2024 Mar-13  PM 04:21
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **RAM-ELLSWORTH** | } | |
| **SUBDIVISION PARTNERS, LLC,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  5:22-cv-00779-MHH** |
| | } | |
| **CONSTRUCTION SERVICES,** | } | |
| **LLC, D/B/A MCA** | } | |
| **CONSTRUCITON, INC.,** *et al.*, | } | |
| | } | |
| **Defendants.** | } | |

## <u>MEMORANDUM OPINION AND ORDER</u>

This action concerns a dispute over work defendant Construction Services LLC, d/b/a MCA Construction, Inc. performed in a housing subdivision in Cullman County, Alabama.  Plaintiff RAM-Ellsworth Subdivision Partners, LLC owned and developed the subdivision.  Nearly one year into the project, RAM and MCA had a falling out, and MCA filed a lien against the property for $1,771,933.29.  RAM then sued MCA, and MCA asserted counterclaims against RAM.

In this opinion, the Court considers whether Alabama public policy prevents MCA from recovering for work it performed for RAM before the parties' relationship soured.  RAM argues that under Alabama law, MCA cannot recover because MCA did not have a valid general contractor's license when MCA assumed

work on the project from its predecessor company. Before reaching the licensing issue, the Court pauses to examine subject matter jurisdiction in this case. Then the Court describes the summary judgment standard and the facts relevant to the licensing issue. Finally, applying the summary judgment standard, which requires the Court to view the disputed evidence in the light most favorable to MCA, the non-movant, the Court examines the law that governs the licensing issue and applies that law to the parties' evidence.

## I.

Although the parties do not contest the Court's jurisdiction, the Court must ensure that it has subject-matter jurisdiction over this action. *DeRoy v. Carnival Corp.*, 963 F.3d 1302, 1311 (11th Cir. 2020). RAM sued MCA, William Miller, and several other defendants in the Circuit Court of Cullman County, Alabama. (Doc. 1-1). Mr. Miller removed this action to federal court pursuant to 28 U.S.C. § 1332, the statute that enables federal courts to exercise jurisdiction over state-law claims when the plaintiffs and the defendants are citizens of different states, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

For individuals, "[c]itizenship is equivalent to 'domicile' for purposes of diversity jurisdiction." *Travaglio v. Am. Exp. Co.*, 735 F.3d 1266, 1269 (11th Cir. 2013) (quoting *McCormick v. Aderholt*, 293 F.3d 1254, 1257 (11th Cir. 2002)). Domicile is the place of an individual's "true, fixed, and permanent home and

principal establishment, and to which he has the intention of returning whenever he is absent therefrom." *McCormick*, 293 F.3d at 1257–58 (quoting *Mas v. Perry*, 489 F.2d 1396, 1399 (5th Cir. 1974)). A change in domicile requires "a concurrent showing of (1) physical presence at the new location with (2) an intention to remain there indefinitely." *McCormick*, 293 F.3d at 1258 (alteration adopted) (quoting *Mas*, 489 F.2d at 1399).

A corporation is a citizen of its state of incorporation and of the state in which the corporation has its principal place of business. *Holston Invs., Inc. B.V.I. v. LanLogistics Corp.*, 677 F.3d 1068, 1070 (11th Cir. 2012) (per curiam); 28 U.S.C. § 1332(c)(1). An unincorporated entity, such as a limited liability company, is a citizen every state of which the entity's members are citizens. *Rolling Greens MHP, L.P. v. Comcast SCH Holdings L.L.C.*, 374 F.3d 1020, 1022 (11th Cir. 2004) ("To sufficiently allege the citizenships of these unincorporated business entities, a party must list the citizenships of all the members of the limited liability company and all the partners of the limited partnership."); *Thornhill v. Alexandria Mall Co.*, 2009 WL 1664026, at *2 (W.D. La. June 8, 2009) ("For each member of an LLC or partnership, its members and their citizenship must be identified and traced up the chain of ownership until one reaches only individuals and/or corporations because only natural persons and corporations have a legal existence—for diversity purposes—that is not dependent on the citizenship of their constituent members.").

3

RAM alleged in its complaint that it is "an Alabama limited liability company with its principal place of business in Birmingham, Alabama." (Doc. 1-1, p. 3, ¶ 1). In his notice of removal, Mr. Miller states that, "[u]pon information and belief, [RAM's] members are citizens of Alabama or are at least not citizens of the same state as any Defendant." (Doc. 1, p. 4, ¶ 11). In its corporate disclosure statement, RAM asserts that its members are a trust, three limited liability companies, and an individual, all based in Alabama. (Doc. 59). Thus, RAM seems to be a citizen of Alabama for purposes of diversity jurisdiction.[1]

The defendants are citizens of Mississippi. The sole member of Construction Services, LLC is MCA Construction, Inc. MCA is incorporated in and has its principal place of business in Mississippi. (Doc. 1, p. 4, ¶ 12). CMM Consulting, Inc. is incorporated in Mississippi and has its principal place of business in Mississippi. (Doc. 1, p. 4, ¶ 13). William Miller is a citizen of Mississippi. (Doc. 1, p. 4, ¶ 14). Finally, though RAM alleged that Caroline Miller is a resident of St. Clair County, Alabama, (Doc. 1-1, p. 3, ¶ 5), Mr. Miller asserted in his notice of removal

---

[1] In its corporate disclosure statement, RAM lists as its members the Claire Wilson Blaylock Revocable Trust; Charles Wilson Blaylock, Jr.; Midwest Sporting Supplies – Southeast, LLC; JS Group, LLC; and SPLCO Holdings, LLC, and RAM explains that the members of the unincorporated entities are Alabama residents. (Doc. 59, p. 1). For purposes of establishing diversity jurisdiction, "[r]esidence alone is not enough." *Travaglio*, 735 F.3d at 1269 (citations omitted). As explained above, for individuals, citizenship is based on domicile, which requires a showing of "both residence in a state and an intention to remain there indefinitely." *Travaglio*, 735 F.3d at 1269 (internal quotation marks and citation omitted). Within three days of the date of this opinion, RAM must inform the Court whether the members of any of its member entities are domiciled in Mississippi so that the record concerning diversity of citizenship is clear.

that Ms. Miller has not lived in Alabama since July 2021 and that she "currently, and at the time this lawsuit was commenced, is a citizen and resident of Rankin County, Mississippi and thus is deemed to be a citizen of Mississippi." (Doc. 1, p. 4, ¶ 15). Mr. Miller attached to his notice of removal an affidavit from Caroline Miller in which she states that she is "a resident citizen of Rankin County, Mississippi, and intend[s] to remain there indefinitely," that she runs a business located in Mississippi, and that she has not lived at the listed Alabama address "since July 2021." (Doc. 1-6, p. 3). Thus, Ms. Miller is domiciled in and is a citizen of Mississippi for the purposes of diversity jurisdiction. *See Smith v. Marcus & Millichap, Inc.*, 991 F.3d 1145, 1149 (11th Cir. 2021) ("Courts look to various factors in determining a person's intent to remain in a state, including . . . business ownership . . . and sworn statements of intent.").

Because RAM and the defendants are citizens of different states, and more than $75,000 is in dispute in this action, the Court may exercise jurisdiction over this action pursuant to 28 U.S.C. § 1332.

## II.

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, a district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "If the movant bears the burden of proof on an issue, because,

as a defendant, it is asserting an affirmative defense, it must establish that there is no genuine issue of material fact as to any element of that defense." *Int'l Stamp Art, Inc. v. U.S. Postal Serv.*, 456 F.3d 1270, 1274 (11th Cir. 2006) (citing *Martin v. Alamo Cmty. Coll. Dist.*, 353 F.3d 409, 412 (5th Cir. 2003)).  To demonstrate that a genuine dispute as to a material fact precludes summary judgment, a party opposing a motion for summary judgment must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).  "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

When considering a summary judgment motion, a district court must view the evidence in the record in the light most favorable to the non-moving party and draw reasonable inferences from that evidence in favor of the non-moving party.  *Sconiers v. Lockhart*, 946 F.3d 1256, 1260 (11th Cir. 2020).  "The standard of review for cross-motions for summary judgment does not differ from the standard applied when only one party files a motion, but simply requires a determination of whether either of the parties deserves judgment as a matter of law on the facts that are not disputed. The Court must consider each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration." *Ala. Mun. Ins.*

*Corp. v. Scottsdale Ins. Co.*, 297 F. Supp. 3d 1248, 1252 (N.D. Ala. 2017) (quoting

*S. Pilot Ins. Co. v. CECS, Inc.*, 52 F. Supp. 3d 1240, 1242–43 (N.D. Ga. 2014)).

## III.

The evidence relevant to the narrow summary judgment issue before the Court

indicates that sometime before July 2020, RAM or its agent, Retail Specialists, LLC,

contracted with Meredith Environmental, Inc. for infrastructure and sitework for

phase 1 of the Ellsworth Subdivision project in Cullman, Alabama. (Doc. 26-1, p. 2,

¶ 3; Doc. 50-1, pp. 1–2, ¶¶ 1, 4).[2]  At the time, William Miller and John Meredith

were the principals of Meredith Environmental. (Doc. 26-1, pp. 4–5, ¶¶ 13–14).  At

some point after Meredith Environmental began working on the Ellsworth project,

Mr. Miller and Mr. Meredith decided to part ways.  The parties dispute the date

Mr. Miller left Meredith Environmental, but it is undisputed that on July 16, 2020,

Mr. Meredith sent an email informing RAM and Retail that "he and [Mr. Miller]

were splitting," that "Meredith Environmental, Inc., [was] no longer involved with

the residential development side of Retail Specialist," and that "[f]uture invoices for

Ellsworth [would] be submitted by Miller . . . under his new company MCA

Contractors." (Doc. 26-2, p. 1).

---

[2]  According to RAM, Retail Specialists, LLC is a manager and agent of RAM. (Doc. 29, p. 6 n.3).  The parties seem to dispute whether Retail or RAM negotiated the contract with Meredith Environmental. (*Compare* Doc. 27, p. 3 n.1, *with* Doc. 29, p. 6 n.3).  For the reasons explained in this opinion, this dispute is not material to the Court's consideration of RAM's argument that, as a matter of public policy, MCA may not recover for work performed on the Ellsworth project.

Between July 2020 and August 2020, MCA submitted three invoices for "Ellsworth Phase 1 Grading and site prep" totaling $288,852. RAM paid the three invoices. (Doc. 16-1, p. 3 ¶ 4, pp. 6–8; Doc. 49-1, p. 2, ¶¶ 10–12; Doc. 54-1, pp. 2–3, ¶¶ 4–6, pp. 5–6).[3] When MCA submitted these invoices, neither MCA nor Mr. Miller had an active Alabama general contractor's license.

On August 16, 2020, MCA applied for a license with the Alabama Licensing Board of General Contractors. (Doc. 26-1, pp. 6–8, ¶¶ 25, 27, 34). MCA included with its application a November 21, 2018 affidavit from Tiffany Loveless, then the IT Systems Manager for the Licensing Board, indicating that "Construction Services LLC" had previously been licensed from July 3, 2008, through October 31, 2012, and that no disciplinary action had been taken against Construction Services while it was licensed. (Doc. 16-2, p. 18). MCA stated in its application that it held licenses in Mississippi, Louisiana, and Florida and sought to be licensed in Alabama on a reciprocal basis. (Doc. 16-2, pp. 12, 14–15).

---

[3] The parties dispute whether MCA was acting as the general contractor for the Ellsworth project when MCA submitted the July and August invoices. RAM points to these invoices and conversations with and emails from Mr. Miller to argue that MCA had taken over as general contractor the Ellsworth project. (Doc. 50, pp. 3–9). MCA acknowledges that it sent the invoices and that it worked on the Ellsworth project in this timeframe but asserts that it was acting as a subcontractor for Meredith Environmental. (Doc. 51, p. 2, ¶ 3). MCA argues that Mr. Miller and Mr. Meredith did not finally separate until January 2021 and that MCA did not officially take over as the general contractor until after it received its general contractor's license and after RAM directed that MCA replace Meredith Environmental on the permit issued by the City of Cullman. (Doc. 27, pp. 5–9; Doc. 51, pp. 3–6). For RAM's summary judgment motion, the Court must accept MCA's version of events, but the Court does not have to dwell on the factual dispute as to timing to resolve the narrow summary judgment issue concerning Alabama public policy.

On October 1, 2020, the Licensing Board issued a general contractor's license to MCA under the name "Construction Services LLC" with a "building construction" certification. (Doc. 16-2, p. 26). After MCA received this license, between November 2020 and September 2021, MCA worked on the Ellsworth project and submitted invoices for its services. (Docs. 49-5 through 49-12). On May 12, 2021, MCA added a "municipal and utilities" classification to its contractor's license. (Doc. 49-1, p. 5, ¶ 30). On June 1, 2021, MCA submitted two invoices for work performed after it received the additional "municipal and utilities" classification. (Docs. 49-13, 49-14). According to MCA, after it received its Alabama license, RAM paid MCA for work performed in November 2020, February 2021, March 2021, June 2021, and August 2021 for a total of $773,234.37. (Doc. 26-1, pp. 9–10, ¶ 40).

On September 30, 2021, RAM and MCA signed a written agreement for MCA to perform sewer repairs for phase 1 of the Ellsworth project. (Doc. 49-15). Afterwards, the parties had a falling out, and on December 28, 2021, MCA filed a verified statement of a lien for $1,771,933.29 on the Ellsworth property in the Probate Court of Cullman County, Alabama. (Doc. 1-1, p. 5, ¶ 25; Doc. 1-3, pp. 16–17).

On March 18, 2022, RAM filed this action.  (Doc. 1-1).  On May 6, 2022, MCA answered RAM's complaint and asserted counterclaims for breach of contract and enforcement of its lien.  (Doc. 1-3).

## IV.

In its motion for summary judgment on MCA's counterclaims, RAM argues that because MCA did not have a valid Alabama general contractor's license when MCA became responsible for work on the Ellsworth subdivision project, as a matter of public policy, MCA cannot recover for the work it performed.  (Doc. 15).  RAM also argues that even after MCA held a valid general contractor's license under Alabama Code § 34-8-1, the license had the incorrect classification; MCA had a "building construction" classification on its license, but the work MCA performed required MCA to have a "municipal and utility" classification.

MCA has filed a cross-motion for summary judgment on RAM's licensure defense.  (Doc. 25).  MCA relies on *McNairy v. Sugar Creek Resort, Inc.*, 576 So. 2d 185 (Ala. 1991), to argue that it may recover for the work it performed on the Ellsworth subdivision project because it substantially complied with Alabama's general contractor licensing statute.

Under Section 34-8-1 *et seq.* of the Alabama Code, those who wish to conduct business as a general contractor in Alabama must obtain a license from the Alabama

State Contractors Licensing Board. Ala. Code § 34-8-2.[4] It is a misdemeanor offense to engage in general contracting without authorization. Ala. Code § 34-8-6. These statutes raise revenue, "protect the public against incompetent contractors," and "assure properly built structures which are free from defects and dangers to the public." *Architectural Graphics & Const. Servs., Inc. v. Pitman*, 417 So. 2d 574, 576 (Ala. 1982) (citing *Cooper v. Johnston*, 283 Ala. 565, 219 So.2d 392 (1969)).

The Alabama Supreme Court has held that express or implied contracts with unlicensed contractors for work performed in Alabama are unenforceable as a matter of public policy:

> The importance of the regulatory nature of the statute, and the protection it affords the citizens of Alabama, cannot be avoided by unlicensed contractors who, through creative schemes, seek to circumvent the requirements of § 34–8–1 et seq. See, for example, *Cochran v. Ozark Country Club, Inc.*, 339 So.2d 1023 (Ala.1976). Similarly, an unlicensed contractor will not be afforded the privileges that come from the statute because of its association with a licensed contractor (see *Cooper v. Johnston, supra*); because of its obtaining a license subsequent to the execution of the contract (*see Architectural Graphics & Construction v. Pitman*, 417 So.2d 574 (Ala.1982)); or because of the equally inequitable conduct of the other contracting party (*see Cochran v. Ozark Country Club, Inc., supra*).

---

[4] Under Alabama law, a "general contractor" is "one who, for a fixed price, commission, fee, or wage undertakes to construct or superintend or engage in the construction, alteration, maintenance, repair, rehabilitation, remediation, reclamation, or demolition of any building, highway, sewer, structure, site work, grading, paving or project or any improvement in the State of Alabama where the cost of the undertaking is fifty thousand dollars ($50,000) or more." Ala. Code § 34-8-1(a).

*J & M Indus., Inc. v. Huguley Oil Co.*, 546 So. 2d 367, 371 (Ala. 1989); *see also*

*Med Plus Props. v. Colcock Const. Grp., Inc.*, 628 So. 2d 370, 374–75 (Ala. 1993)

(same).

Because, under RAM's version of events, MCA did not have a valid general

contractor's license when MCA took over the Ellsworth project from Meredith

Environmental, RAM contends that MCA cannot recover for the work it performed

as a matter of public policy.  The cases on which RAM relies for its argument are

distinguishable from this case.  In each, the contractor did not have a valid license at

any point during the execution or performance of the contract at issue.

*Cooper*, 219 So. 2d at 396; *Cochran v. Ozark Country Club, Inc.*, 339 So. 2d 1023,

1024 (Ala. 1976); *Dabbs v. Four Tees, Inc.*, 36 So. 3d 542, 555 (Ala. Civ. App.

2008) ("Because Graves was not a licensed contractor at the time that he performed

the work for the Dabbses, their oral contract for the construction of the project is

unenforceable."); *White v. Miller*, 718 So. 2d 88, 89 (Ala. Civ. App. 1998); *Hawkins

v. League*, 398 So. 2d 232, 237 (Ala. 1981); *Architectural Graphics*, 417 So. 2d at

576 (contractor could not recover for work performed without a license where

contractor obtained a valid license after construction was complete); *J & M Indus*,

546 So. 2d at 370; *KLW Enters., Inc. v. W. Ala. Com. Indus., Inc.*, 31 So. 3d 136,

140 (Ala. Civ. App. 2009).  None of the cases RAM directly cites concerns a general

12

contractor's compliance with the licensing statute during the performance of the contract.

The Alabama Supreme Court has permitted general contractors to seek recovery for services rendered without strict compliance with the general contractor's licensing statute. *See McNairy v. Sugar Creek Resort, Inc.*, 576 So. 2d 185, 187 (Ala. 1991) (contractor entitled to seek payment for services where contractor substantially complied with licensing requirements and contract was ratified after contractor received his license); *Twickenham Station, Inc. v. Beddingfield*, 404 So. 2d 43, 46 (Ala. 1981) ("At all times during the contracts there was a valid general contractor's license in the Beddingfield name. Although the Beddingfields' license did not reflect the exact business entity under which they did business until after the contract was completed, we believe there was substantial compliance with the licensing statute.").

In *McNairy*, the general contractor, Mr. McNairy, applied for a contractor's license with Alabama's State Licensing Board on July 6, 1987. 576 So. 2d at 185. With his application, Mr. McNairy filed a confidential financial statement and an authorization for his bank to release information to the Board concerning his finances. 576 So. 2d at 185–86. The bank did not provide Mr. McNairy's information to the Licensing Board on time, so Mr. McNairy's license was delayed until June 20, 1988. 576 So. 2d at 186. Before receiving his license, Mr. McNairy

entered a contract with Sugar Creek Resort to clear areas for golfing ranges and build a road.  576 So. 2d at 186.  After Mr. McNairy began working on the project and submitted bills to Sugar Creek, Mr. McNairy received his general contractor license. 576 So. 2d at 186.  Sugar Creek acknowledged the amount due for work performed both before and after Mr. McNairy received his license.  576 So. 2d at 186.  When Sugar Creek paid Mr. McNairy only some of the amount due for his services, Mr. McNairy filed a mechanics lien to recover the balance.  576 So. 2d at 186.

The trial court reasoned that because Mr. McNairy did not have a general contractor's license when he agreed to perform work for Sugar Creek, he could not recover under the agreement.  576 So. 2d at 186.  The Alabama Supreme Court reversed.  Though Mr. McNairy did not have a valid license when he entered the agreement with Sugar Creek, "McNairy continued to perform work for Sugar Creek, and its president, Carroll Wright, continued to acknowledge, both before and after the license was issued, that McNairy was entitled to receive payment for this work." 576 So. 2d at 187.  The Alabama Supreme Court relied on its decision in *Day v. Ray E. Friedman & Co.*, 395 So.2d 54 (Ala.1981).  In that case, the Alabama Supreme Court held that allowing a plaintiff who substantially complies with a licensing statute to recover under a contract does not defeat the penal purpose of the licensing statute.  576 So. 2d at 187.  The Alabama Supreme Court found that "the purpose of the statute [was] not defeated by allowing McNairy to proceed to trial on his claim

14

for monies due him for work and labor done under his agreement with Sugar Creek."
576 So. 2d at 187–88.

RAM argues that *McNairy* was wrongly decided, has been "utterly ignored"
by Alabama courts in addressing breach of contract claims with unlicensed
contractors, and is factually distinguishable and thus not applicable. (Doc. 29,
pp. 8–10; *see also* Doc. 16, pp. 12–13). The Court is not persuaded, and this Court
is not alone.

In *RC Underground v. Western Surety Company*, Case No. 5:20-cv-01222-
LCB (N.D. Ala. July 14, 2021), plaintiff RC Underground contracted with Bear
Communications, LLC to perform drilling work on a public-works project. The day
after it signed the agreement for the work, RC applied to the Alabama Secretary of
State's Office to do business in Alabama as a foreign company. The Secretary of
State's Office initially rejected RC's application but later issued the license. Before
RC received its license, RC began working on the project and kept Bear apprised of
the status of the license applications. Bear made several payments to RC for its work
on the project. After Bear stopped making payments, RC sued Western Surety
Company to recover on the bond Western provided Bear for the project.

Western moved to dismiss, arguing that RC's contract with Bear was
unenforceable because RC was not a licensed subcontractor. Citing *McNairy*, RC
argued that dismissal was inappropriate because the company had substantially

complied with the contractor licensing requirements.  Western argued that the facts

were unlike *McNairy* and that *McNairy* is an outlier.  The district court rejected

Western's argument, stating:

> Despite Western's protestations to the contrary, *McNairy*'s facts are
> markedly similar to those before the Court. The record shows that RC
> appropriately sought a license from the Secretary, that Bear was aware
> of RC's application and assisted RC with it, that Bear repeatedly
> ratified and adopted the parties' agreement before and following
> licensure, and that the amount RC seeks to collect is directly related to
> work completed following its licensure. (*See generally* Doc. 9-1).

> While the Court is mindful that *McNairy* has been sparsely cited in the
> 30 years since it was issued, this does not detract from its precedential
> value.  Rather, absent a clear indication to the contrary from the
> Alabama Supreme Court, *McNairy* controls and the Court is bound to
> apply it.  And Western's contentions about Alabama courts not citing it
> are unavailing.  *See Bravo v. United States*, 577 F.3d 1324, 1325 (11th
> Cir. 2009) (quoting *King v. Order of United Commercial Travelers of
> Am.*, 333 U.S. 153, 158 (1948): "[F]ederal courts are bound by
> decisions of a state's intermediate appellate courts unless there is
> persuasive evidence that the highest state court would rule otherwise.").
> Review of those several cases from Alabama's appellate and federal
> courts which occurred after *McNairy* reveals that none of those matters
> directly concerned a sub-contractor's substantial compliance with
> Alabama's licensing requirements.  *See Med Plus Properties v. Colock
> Const. Group, Inc.*, 628 So. 2d 370, (Ala. 1993) (concerning scheme to
> undermine state's licensing requirements); *KLW Enters., Inc. v. West
> Alabama Commercial Indus., Inc.*, 31 So. 3d 136, 139–140 (Ala. Civ.
> App. 2009) (focusing on appellant's in pari delicto argument); *B.D.
> Stephenson Trucking L.L.C. v. Riverbrooke Capital Partners, L.L.C.*,
> 2006 WL 2772673 (S.D. Ala. Sept. 25, 2006); *Constr. Servs. Grp., LLC
> v. MS Electric, LLC*, 292 So. 3d 643, 650 (Ala. Civ. App. 2019).
> Because the Alabama Supreme Court has found a substantial
> compliance exception to the state's contractor licensing requirements
> and RC's actions meet its requirements, the Court finds dismissal
> inappropriate.

*RC Underground*, Case No. 5:20-cv-01222-LCB (N.D. Ala. July 14, 2021) (Doc. 16, pp. 8–9).

As in *RC Underground*, this Court concludes that *McNairy* is binding, relevant authority.  As a federal court sitting in diversity, this Court must "apply the law of the state in which the federal court sits" and "should, whenever possible, 'reach the same result as the state court would reach in deciding the identical issue.'" *Goodwin v. George Fischer Foundry Sys., Inc.*, 769 F.2d 708, 711 (11th Cir. 1985) (quoting *Trimper v. Nationwide Ins. Co.*, 540 F. Supp. 1188 (D.S.C. 1982)).  Thus, this Court must "function as an Alabama court in deciding the issue presented in this case"—that is, whether an agreement to provide construction services is void as a matter of public policy when the general contractor has substantially complied with the state's licensing statute during performance of the contract.  *Goodwin*, 769 F.2d at 711.

In *Goodwin*, in addressing whether a contract should not be enforced as a matter of public policy, the Eleventh Circuit observed that Alabama courts have stated:  "the true test to determine whether a contract is unenforceable because of public policy is 'whether the public interest is injuriously affected in such substantial manner that private rights and interests should yield to those of the public.'"  769 F.2d at 713 (quoting *Colston v. Gulf States Paper Corp.*, 282 So. 2d 251, 255 (Ala. 1973)).  "[T]he principle that contracts contravening public policy are

unenforceable should be applied cautiously and only in cases plainly within the reason for it," *Goodwin*, 768 F.2d at 713 (citing *Lowery v. Zorn*, 9 So. 2d 872, 874 (Ala. 1942)), and "[i]t is repeated often in the cases that there must be a dominating public interest," *Goodwin*, 768 F.2d at 713 (citing *Ex parte Rice*, 61 So. 2d 7 (Ala. 1952)).

In a case dealing with the enforceability of a contract under a similar licensing statute, the Alabama Court of Civil Appeals explained the power of a court to declare a contract void as a matter of public policy "should be exercised only in cases free from doubt":

> The courts are averse to holding contracts unenforceable on the ground of public policy unless their illegality is clear and certain. Since the right of private contract is no small part of the liberty of the citizen, the usual and most important function of courts of justice is to maintain and enforce contracts rather than to enable parties thereto to escape from their obligations on the pretext of public policy, unless it clearly appears that they contravene public right or the public welfare. …

> Many courts have cautioned against recklessness in condemning agreements as being in violation of public policy. Public policy, some courts have said, is a term of vague and uncertain meaning which it is the duty of the law-making power to define, and courts are apt to encroach upon the domain of that branch of the government if they characterize a transaction as invalid because it is contrary to public policy, unless the transaction contravenes some positive statute or some well-established rule of law. Other courts have approved the statement of an English judge that public policy is an unruly horse astride of which one may be carried into unknown paths. Considerations such as these have led to the statement that the power of the courts to declare an agreement void for being in contravention of sound public policy is a very delicate and undefined power and, like the power to declare a

18

statute unconstitutional, should be exercised only in cases free from doubt.

*Terrell v. Oak & Alley Homes, LLC*, 334 So. 3d 506, 512–13 (Ala. Civ. App. 2021) (citation omitted) (quoting *Milton Const. Co. v. State Highway Dep't*, 568 So. 2d 784, 788 (Ala. 1990), *overruled in part on other grounds by Ex parte Ala. Dep't of Transp.*, 978 So. 2d 17, 23 (Ala. 2007)).

Applying these principles, Alabama public policy does not prevent MCA from recovering for the work it performed for RAM on the Ellsworth project. Even if the parties' agreement concerning the project predates MCA's acquisition of an Alabama license with a proper designation for the work performed, the evidence shows that MCA previously had held an Alabama general contractor's license under the name "Construction Services LLC," and MCA was licensed in other states and was seeking reciprocity. The Licensing Board issued MCA's general contractor's license fewer than two months after MCA applied for the license. MCA worked on the Ellsworth project and received payment from RAM for approximately one year before the parties' relationship soured. During that year, RAM and MCA expanded the scope of MCA's work on the Ellsworth project to add sewer repairs. RAM has admitted that it paid MCA's pre-licensure invoices. As in *McNairy* and *RC Underground*, the amount that MCA seeks to recover relates directly to work MCA performed after it received its license, and by its partial payments to MCA for work performed after MCA received its license, RAM acknowledged that MCA was

entitled to receive payment for services rendered. Allowing MCA to recover for work performed for RAM does not defeat the purpose of Alabama's general contractor's licensing statute.

To the extent RAM argues that MCA did not have the correct license classification for the work performed, RAM has not cited binding or persuasive authority to support the proposition that a contractor with a valid license cannot recover for work performed because the license did not have the correct classification.[5] If MCA had to have a "municipal and utility" classification on its license for the work it performed, *McNairy* still applies because MCA substantially complied with the statute.

## IV.

Because RAM has not shown that, as a matter of law, MCA's non-licensure at the time the parties agreed for MCA to take over the Ellsworth project bars MCA from succeeding on its counterclaims, RAM is not entitled to summary judgment on

---

[5] To support its argument that MCA cannot recover because it did not have the correct classification on its license, RAM points to a case in the Circuit Court of Baldwin County, Alabama involving a nearly identical dispute between MCA and RAM-Robertsdale Subdivision Partners, LLC. *RAM-Robertsdale Subdivison Partners, LLC v. Constr. Servs., LLC d/b/a MCA Construction, Inc., et al.*, 05-CV-2022-900285 (Cir. Ct. Baldwin Cnty. Nov. 10, 2022), *appeal dismissed sub nom. Constr. Servs., LLC v. RAM-Robertsdale Subdivisions Partners, LLC*, --- So. 3d ---, 2024 WL 132956 (Ala. 2024). There, the state trial court granted summary judgment in favor of RAM-Robertsdale on the issue of whether MCA was barred from enforcing its contract because it did not have a "municipal and utility" classification. The trial court's decision is not binding on this Court, and the trial court offered no explanation or analysis for its ruling. (*See* Doc. 29-1, p. 61). Therefore, the Court will not follow the state trial court's decision.

MCA's counterclaims based on this licensure defense.  The Court asks the Clerk to please **TERM** Docs. 15, 25, 30, and 50.

**DONE** and **ORDERED** this March 13, 2024.

_Madeline H. Haikala_

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE